Thank you, Your Honor. Good morning. May it please the Court. I'm Eugene Olavsky, by appointment to argue on behalf of Mr. Dugan. I'd like to reserve four minutes. So just watch the clock. I will do. I think that I really can help the Court the most on two issues here. One is the warrantless search of Mr. Dugan's house, and then one is the speedy trial act. The warrantless search. We're asking the Court to reverse Mr. Dugan's conviction. When the San Jose police searched Mr. Dugan's house without a warrant, they violated the Fourth Amendment. What we're talking about is the government sometimes refers to it as the sweep. It's when they follow Mr. Dugan's wife into the house and look around. And the government concedes that it's not a Maryland against Bowie protective sweep because it's not incident to a lawful arrest. So it's really a search. And I'm going to call it a search. It's the first domino that falls. And so if the Court decides that this search is bad, all the subsequent stuff is out, Mr. Dugan's consent and all of the other almost all the evidence used to convict him. Well, there would be two arguments against the validity of the search. One would be the emergency exception, and the other would be consent. So maybe help us with those two. Yes, Your Honor. I think that so there are actually two, consent aside because I'm going to address that, there are actually two warrant exceptions. One is the emergency doctrine, so to speak, and one is exigent circumstances. The emergency doctrine is the one, it's Brigham City, it's the police are responding and they see that there is a need for immediate aid to prevent someone in the house from suffering serious harm, immediate need to prevent serious harm in the house. Those are the instances where there's no Fourth Amendment barrier around the emergency   someone in the house from suffering serious harm in the house, immediate need to prevent serious harm in the home. You could think of the typical emergency cases, the police smell, you know, a chemical odor or a gas leak inside a house. They think it's going to blow up and hurt everybody in the area, so they run in. And while they're running in, they see evidence. In other words, they're working in their community caretaker function, as this Court has said, not in their function of investigating crimes. The emergency. But don't we have to take into account the circumstances which brought them there in the first place? Absolutely. And in this case, it's very, I think, clear that when they get there, there is no ongoing emergency. The cases that are emergency cases, including the ones that the government cites, are all situations where when the police get to the house, there is something going on. The Supreme Court case, Brigham City. The police are outside. They look in the house. They see four adults and a juvenile plaintiff. And in this case, there had been a 911 call that somebody was being beaten up, and they could hear somebody yelling and they heard slapping sounds. So there was reason to think there was a domestic violence situation. Correct? No. Actually, Your Honor, no. In the Martinez case, for example, when the police get to the house, the woman's outside. She's on the lawn. You're right. They're screaming inside the house. Here, there's a 911 call. You're absolutely right. Let me ask you a different question, though. The district court, I think, did not rely on the allegation that the wife had consented impliably to the entry further into the house. But would you address whether you think there was implied consent by her? Yes, Your Honor. Absolutely not. No complied consent in this Court has ruled on precisely those facts. The case, it's not in Mr. Dugan's reply brief, and I apologize for that. But if the court looks to its case of United States against Shebu, and that is 920 Fed 2nd, 1423, that's a situation where the government cites the Vongshe case. Vongshe is a case where a bunch of gangbangers are out in front of a nightclub, and the police officer goes over to one of the guys and says he's carrying a weapon. And the guy doesn't respond. The police officer asks him if he's carrying. The guy doesn't respond. He puts his hands up. He puts his hands up over his head. And the court held that that was implied consent. In other words, the court would infer consent from that conduct. In Mr. Dugan's case, we have a situation where Ms. Zhu, his wife, is followed by the police officers after the police officers have had a conversation that dispels any idea that there was any kind of a fight, just a loud argument, that there was no violence. They follow her in. They don't make a request. So it's not like Vongshe. There's no request and there's no conduct. The only thing that the government points to is the fact that they didn't object. In Shibu, this Court said that that case was very similar, where they go to a house, it's an apartment building, and they're looking for a guy, and they go to a room, and Shibu, I think, comes out of the room, and then they ask where the guy is, and he doesn't say anything, and they follow the guy in. The district court said that was an implicit invitation because the guy didn't object to the police following him to the apartment. And this Court reversed, and it's – first of all, said it's de novo because even though a finding of whether there was consent is subject to clear error, whether certain types of actions give rise to an inference is reviewed de novo. That's 1427, 920. But then the second point is that this Court said when it comes to a home, we're not going to infer from the occupant's silence that there is consent. The Court said, quote, we interpret failure to object to the police officer's thrusting himself into Shibu's apartment as more likely suggesting submission to authority than implied or voluntary consent. They were really focused, the Court was focused there also on the fact that they said, quote, it's one thing to infer consent from actions responding to a police request. So Vonshay, for example, where the response is like that, he puts his hands up. The Court said it's quite another to sanction the police walking into a person's home without stomping at the door to ask permission. So I think in that situation, Your Honor, with the – this Court has already decided that when it comes to the home, we are not going – and I think the Court said there that when it comes to the home, it's not going to infer consent so easily, and certainly not just from a lack of any objection to the police following, where there's no request whatsoever. And in this case, again, the facts uncontested, not challenging any factual findings. There's no request and there's no objection. But what about the written consent in Exhibit 31 in the trial? The written consent comes later in time, and so I agree that the district court made a finding that the signing of that consent was voluntary. That's later in time. That's in the briefs, and I'm not really – I'm not really focusing on that right now, because this search is prior. What happens with this search that the government calls a sweep is that when the wife goes in, because she comes out, they ask her, were you hit? And she goes – she goes, no. They say to Dugan, were you fighting? Well, we're loud. So that's it. The conversation right there. It's like none of these other cases. It's stopped. There's no reason to think that there's anything going on or there's anybody in immediate need of being protected from serious harm inside the house. Mr. Dugan says to her, says, I've got a Prop 15 recommendation, go get it. She turns around. She goes from the enclosed patio, opens the doors, goes in to get it. Police officer follows her. When he follows her, he looks around. He's checking stuff. He's checking closets. He goes in the garage, sees marijuana plants in the garage, sees it in a cabinet. When she opens a drawer, he sees what he called a gun rug, which I think is like maybe a holster of some type. So all of that stuff – that's why I said that's the first domino. Then they come back. They call more officers to the place. They hold them for an hour and a half. And then after an hour and a half with all the police officers, they – he finally consents to the search. The Court has held before in other cases that where the defendant who has consented is present during an initial illegal entry, that the illegal entry really taints everything that follows. And certainly, had there not been that improper sweep or search, the first time they wouldn't have called the additional officers, none of this other stuff would have happened. So I think that it's clear that there's no ongoing emergency, not like any of the cases that we've seen or that this Court has cited, where the police have, as the cases say, I think the formulation is an objective, objectively reasonable basis to think that there's something urgent, emergency going on. And certainly, the police here are not acting like they're responding to an emergency. They're not breaking down doors. They're not rushing in. They're not – it's not like they're going to a fire. They're stopping and they're talking and they're – they're then – and they're following. Now, Counsel, you're not contesting the written consent. Would that segregate the evidence in some way? Some of it would be subject to the consent and some of it would not be in accordance with your earlier argument? So just a correction. I mean, in the briefs, Mr. Duggan does challenge the district court's finding. That's subject to clear error determination. He does challenge the district court's finding. I would say that there – I'd say that all of the evidence goes out. I think it's probably something best determined by the district court. I think this Court should reverse remand to the district court, and the district court can try to unscramble the A, or at least the government could have a chance to unscramble the A. Well, assume for the sake of argument we would hold that there was no clear error with respect to the written consent. How does that separate out some of the evidence, or does it? I don't think it does. I think – I think everything has to go, and I think it's all kind of a – a – it stems from the initial illegal entry. The only thing that's really not – You claim that the written consent was coerced by the police officers as a result of their illegal entry? That's a – yeah. Well, Your Honor, that's not precisely the argument in the briefs, and that's not the argument I'm making. In the argument in the briefs, it is that the consent was coerced because there were a lot of police officers, the defendant was held there for a long time. Explain to me why, if the original entry by the police officer for the, quote, protective sweep following the wife in, after finding out that the wife wasn't injured, if that is an improper search, why is that not overcome by the express written consent by Mr. Dugan and allows all the evidence that was found as a result of the express written consent to come in? Well, Your Honor, I'm not sure that a constitutional violation like that can be – that that constitutional bell can be unrung at that point. And I think that's the thrust of the cases. They're not cited in the reply brief, but the cases in which this Court has said, look, if the defendant is there during the course of an illegal entry, and now he's making a decision about consent in light of the fact that the police have already gone in and looked around in the place that they are going to search that they're claiming is there's evidence in, that's, in fact, another element that I think spoils that – that consent. So I don't think the signing of the consent, you know, unrings that – that the constitutional bell and the problem with the warrantless search that happened, you know, an hour and a half earlier. If the warrantless search found two marijuana small plants in Mr. Dugan's house and we keep those out, why does it keep out the other 1,085 plants? Actually, it's not that easy to slice it that way, Your Honor, because the warrantless search actually discovers more. When the police officer – I believe the police officer testified that when he goes in and he does – he follows Mr. Dugan, he goes in. First he looks in the garage, that's – and sees the plants there. How much more do you have for us in your briefs or in your mind? Any specific amount of marijuana plants that would be excluded because of the warrantless search, but would be included because of the Exhibit 31? The only marijuana that I believe would be included, Your Honor, are the marijuana plants that are in the enclosed patio at the time of the initial entry. I think every – Included in what? I mean – I'm sorry? I think it's 40-something. The warrantless search exclude – tell me what the warrantless search excludes under your theory, and the consent includes, if it's valid. I don't think the consent is valid. I think that the warrantless search – I didn't ask you that. I asked you to assume that the consent was valid. What amount of marijuana plants are included in the evidence seized under that consent and would come in anyway? I'm going to prejudice, in case you didn't know. Yeah. I don't – Your Honor, I don't believe that the record is sufficiently clear to establish that. I believe that the – when the police make the initial entry into the enclosed patio and there's some number of plants there, I don't think there's – I don't think there's an issue there. Then they do – There's no issue of what? No issue of whether those – I'm not saying that those plants – Can they come into evidence or can they not come into evidence? I don't think that those – those plants –  Go ahead. I'm getting a little excited here. I think that the – under the theory challenging the sweep, obviously, if the initial entry is okay into that enclosed patio, then those plants would not be excluded. I think that there's – But if it's not valid, warrantless search, those plants are excluded. How much more is excluded? Again, I would say everything in the house would be excluded. And nothing would be included by the express written consent of Mr. Dugan? Yes. Oh, I understand your point. Yes. So, again, there's no emergency – the emergency exception is not met. And then the government also argued in its brief the United States against It seems to be arguing that Brooks is an emergency case, but Brooks is a case, of course, involving exigent circumstances. That is a different test because exigent circumstances lets the police search a house without a warrant if there is probable cause to believe that there is evidence of a crime in the house and the police can show that there is no time to get a search warrant, as opposed to being able to secure the premises and go and get a search warrant. The police can't be speculating about exigency. They can't be guessing whether there might be somebody or some evidence in the house. And the government has to show particularized evidence. In Brooks, there was probable cause, because when the police went there, they knock on, they got a complaint from the person in the hotel room next door. They actually interviewed that person, as opposed to here, where they didn't. They then went to the room. Brooks admitted that there had been a fight. They didn't see the woman. He claimed that she was in the shower. And the officer said the room was in disarray. Again, here, there's nothing like that. So there's no – there's no probable cause. There's no showing of exigency here in this case at all. Can I ask a question? With respect to the consent form, Dugan signed the consent form and then took the officer to the safe where he kept his guns. Would you claim that that consent was ineffective as to the guns, as well as to any marijuana that was in the house? I would, Your Honor, yes. None of those – none of those guns actually turns out to be the subject of any of the charges that he's convicted of, except, I guess, the 922-G3. Okay. So on the – I'm sorry, on the 922-G3, I believe that those guns should be excluded because, again, I believe that – Even though they were kept in a safe to which Mr. Dugan took the police after signing a written consent? Yes, because I would say, again, that the search is tainted by the original illegal entry. I don't think that you can – from that person's perspective at that time, I don't think that you can separate out the impact of the unconstitutional entry and then, you know, add on hour and a half waiting, four or five police officers in the house. I do want to get to the Speedy Trial Act argument. You indicated an interest in retaining time. You're down to 44 seconds. I guess I'm going to save that 44 seconds. All right, very well. You may do so. Thank you very much. We'll hear from the government. Would I be able to raise the Speedy Trial Act argument? The government may not be able to respond to it. I just wanted to highlight that. You may do whatever you wish. I thought I was third. No problem. Good morning, Your Honors. May it please the Court, my name is Mary Jean Chan and I represent the United States in this appeal. I'd like to spend my time today looking at both the Fourth Amendment and consent issues that were raised by opposing counsel and then maybe briefly talk about the Speedy Trial Act issue since I anticipate you'll try to talk about that on rebuttal. The touchstone of the Fourth Amendment is reasonableness. And every step that the officers took in this case was reasonable in light of what the officers knew. And the actions, if they were objectively reasonable, this Court should not second-guess the police who had to make rapid split-second judgments in a tense, uncertain, rapidly-involving situation, which this Court has said is particularly tense in the context of domestic disturbance calls. I'd like to talk about the emergency exception and how that justifies both the entry by the officers into the Ebison residence, the Stugans residence, as well as Help me, Ms. Chan Yes, Your Honor Maybe I have the facts wrong, but it seems to me that the nine-eleven call was raising the issue that Mr. Duggan was beating his wife, and that's why the policeman went there. The first thing they did, they tried to get in the side door, but then second Duggan said, I'll open the front door, and the wife is produced, and she says, I'm not injured. I'm not hurt. Why isn't that the end of their mission at that point? Why shouldn't they just turn around and go away? Well, Your Honors, the court was not required I'm sorry, the court has said that the police officers are not required to verify the nine-one-one call, but in this case, actually, the officers had some verification. At the time they were at the side entrance, they heard yelling by Duggan, or at least a male voice saying, you can't keep it clean. They heard slapping sounds. So actually, Judge Graber, you were correct before when you said there was both a nine-one-one call, a nine-one-one call, as well as the sound of slapping. When they went to the side door, he heard the sound of an angry male saying, you can't keep it clean, and then, or something to those effect, words to the effect, and then what he said was distinctly a skin-to-skin slapping sound. And they heard that slapping sound before the police were informed by the wife who was produced that she was not injured? That's correct. And they Didn't that have some effect on the slapping sound as a reason for going into the house? I was about to say intruding into the house. Well, Your Honors, it certainly got them inside the house, because it was only once they were inside the house that the woman was produced, and then she was able to respond to the inquiries. In the case of Brigham City v. Stewart, which is the Supreme Court case that talks about the emergency section, talks about it in terms of both emergency and exigency. It doesn't really make a clear distinction between the two. And in that, and it Apart from the facts of this case, who else but the wife was in the house that could be slapped? Well, the officers were not required, as this Court said in Brooks, to accept the wife's claim that she hadn't been hurt. The officer heard That they could see her. They could see her, but they, well, they were She said, I'm not injured, and they could take a look at her. And even if someone, the sound of someone being slapped is a little bit difficult to describe, isn't it? But in any case, let's suppose that it is possible to describe a slapping sound. Who else but the wife was in there? Well, Your Honor, the officers didn't know. Officer Froese said that he wasn't familiar with that house. He didn't know who might be in there. He didn't know whether for sure this was the wife. She said that she was the wife. So they thought that this was a domestic violence response. That's correct, Your Honor. Was there any other member of the domestic team that was supposedly hit there? Was there any information that there was a son or a daughter there or a grandmother or somebody like that? They didn't have that information, Your Honors. They had all the two officers who were responding, Officer Rendler and Officer Froese, only had information that there was a 911 call. A neighbor said that there had been screaming and yelling for the past 20 minutes, and it sounded like a man was beating his wife, so Dugan and his wife. They responded to that. They heard some confirmation of that when they arrived. A neighbor said that the screaming had suddenly stopped upon the police's arrival. So who knew what had happened at that point? But let me ask you this. At the time the police saw the wife and she said, I'm okay, I'm not hurt, what, if anything, incriminating had the police officers seen at that point? Well, at that point, they had seen a large number or large-sized marijuana plants in that front part of the house or the back part of the house. So what's been described as the enclosed patio. So they had seen that, but they weren't really there on the marijuana issue. They hadn't anticipated there would be that issue. But what I wanted to say was that in Brooks, for example. I guess what I want to know is what effect that has on the rest of the claim, because they don't have to take the wife's word for the fact that she's okay, but they physically got her. So if they think she's not okay, they could extricate her from the house, presumably, or do something else to help her. And I'm having some difficulty sort of figuring out what is the justification to go beyond that into other parts of the house. Well, Your Honor, in Brooks, for example, the wife or the woman, the alleged victim, also said that she had not been hurt. And this court said it was reasonable procedure for the officer to continue to ask her questions, not taking her or extricating her from the room, but staying in there and talking with her and really trying to find out more. Well, talking is one thing, and looking around is quite something else, so. Well, that's correct, Your Honor. But in this case, the officer said- As I understand it, in Brooks, we said that it was very common for victims of domestic abuse initially to deny that they had been assaulted. That seems to have been the principle that allowed the further duration of the search in Brooks. That's absolutely correct, Your Honor. And, in fact, in this case, Officer Ordaz, who came later, spoke with the wife, and she, at that point, said that they had been in an argument, she was deathly afraid of Dugan, and, in fact, she wanted to be removed from the house or she wanted to have permission to leave the house. She didn't feel like she had permission. And that only occurred after there was some more probing about whether she, in fact, there was a domestic disturbance. I guess I'm not quarreling with the opportunity to continue to talk to her and make sure that it's really true that she's okay. But what is this justification for looking around, which isn't asking her how she's doing or probing that aspect? Well, there are three justifications in this case, Your Honor. First of all, the officers didn't have to take her word, and it would have been reasonable procedure to take her further away from Dugan to see if she would be truthful if she were out of his presence. They could do that by taking her out of the house, by extricating her, as Graber indicated. They wouldn't have to go in and look around. That's absolutely right, Your Honor. But the Fourth Amendment says that the officers don't have to take the least intrusive means, as long as what they do is reasonable. The second reason is that they didn't have to take Dugan's wife's word for it. So she could have been lying about being injured, or she could have been telling the truth. And, in fact, there was a third person in the house, and perhaps she was the accomplice. The officers just didn't know. So that would have given them a reasonable suspicion, which is all that's required under the emergency exception, not probable cause, foreseeing if there was a third person. And then third, Judge Graber, you talked about this with the implied consent issue, which is – I also apologize, like opposing counsel, that I didn't cite this case, but this Court's case in Mejia, M-E-J-I-A, which is at 953 F. 2nd, 461. It specifically distinguished from Shibu and said that there was implied consent in a case where a woman led officers into the bedroom where her husband was sleeping. It specifically said that, unlike Shibu, this was not a case where the government attempted to justify entry by consent and consent by entry. In other words, in that case, the officers were legitimately lawfully inside the  And so when they asked the wife where her husband was, she said, oh, he's in the bedroom. And she started to walk towards the bedroom. The officers followed, and this Court said, However, once officers were in the house, Kajigas gave a subsequent implied consent to let them enter the bedroom by not objecting when the officers followed her into the bedroom. Presumably, a reasonable person who objected to the officers following her would have said so. The officers could reasonably interpret her behavior to mean that she was leading them to her husband in response to their request. No evidence was presented to indicate that the officers engaged in any inappropriate behavior or that they in any way coerced her. And this is a case where you have something quite similar. You have Dugan who affirmatively, not at the request of the officers to show me the bedroom, same thing with the wife, Dugan specifically said to his wife, go to the master bedroom, go get some documentation. She started to go that way. The officers were legitimately, under this case, to follow her by implied consent, but also concerns about officer safety. In a situation that is fast-changing, perhaps, where they don't know who the individuals are involved, they've seen they know of an allegation of domestic violence, they see drugs, marijuana, they have conflicting accounts about exactly what's going on, it would have been irresponsible to allow one of the people to simply just disappear into the house. Kennedy, Your position is that by the husband saying to his wife, go into the room and get documents, that impliedly said to the police, you can follow her into that room to see if she gets the documents? Well, when they followed her, he didn't object or say anything. It was a combination of his affirmative request for them, for his wife to go to the bathroom. So the implied consent comes from his observation of seeing the officer following and not saying anything. Absolutely, according to the Mejia case, yes. So I would say that, you know, that this Court distinguished the Shibu case explicitly in that case. So that isn't the only reason why that following was reasonable. It was reasonable because they had an allegation of domestic violence, so they knew that there was violence. They heard some corroboration of that by hearing the slap. When they went into the house, they were getting conflicting accounts. Dugan specifically said that he had been in an argument, it was about the wife not keeping the plants clean and letting one of the marijuana plants topple over. The officers actually asked the wife. She said she had not been hurt. Moreover, she actually said she had not been in any argument. There was no problem, nothing at all. So those two accounts were just absolutely conflicting. And based upon that, the presence of the drugs, and the fact that they didn't know what was going on, it was reasonable for them to follow her to the back, especially when there might have been a third person, you know, a third victim or a perpetrator. It was reasonable. Kennedy, what evidence is there that there might have been a third person? Well, the fact that the wife said that she hadn't been involved in any argument. If they have a call that says that there was a 911 call, that there was a yelling and screaming, there was an argument. Dugan says that there was an argument. His wife says that there was no argument. The officers have heard some yelling outside of the house before entering. There's reason, and again, the standard is reasonable suspicion, not even probable cause. Reasonable suspicion to believe that perhaps there might be a third person who was involved, that it's not the woman who they think is Dugan's wife, perhaps it's some other third person. And so, I think Brooks and Martinez both are situations that show that the emergency situation is not dispelled simply by the wife or the potential victim disclaiming being injured. As Judge O'Scanlan stated, the courts have recognized that in these cases, the victims oftentimes will lie. I'd like to also now talk about the consent, because I think that the district courts' order in finding that the consent was voluntary is not clearly erroneous. And since it's not clear, and it sounds like the defense counsel, actually the opposing counsel, doesn't really necessarily challenge that, but simply says that even if it were voluntary, it were somehow tainted by the preceding events. Now, the preceding events, as my first position is, that there's nothing to taint because they were completely legal under the Fourth Amendment. But even if there were some problem with that, there's been no showing that they somehow tainted the consent. There's no showing that Dugan knew what Officer Froese might have seen during that sweep. And, by the way, I also wanted to say, with respect to what Officer Froese saw when he went back, when Ms. Dugan opened the drawer, he saw a ton of marijuana butts, and he also saw evidence of a firearm, which made his concern even greater. Because at that point, he's got evidence of violence, he's got evidence of illegal drugs, a large quantity of illegal drugs, suggesting perhaps distribution, and he's also got evidence of a firearm somewhere in the house. And so that really also gives him additional impetus for being concerned about both the safety of the individuals in the house as well as officer safety. But going again to the consent, there's no relationship between anything that happened prior to the consent and the time that Dugan provided the consent. As Officer Brooks, or Sergeant Brooks, testified, he spoke to Dugan about his opportunity to not consent to a search of his house. Dugan was very cooperative. He wanted to be cooperative. He believed that he had a right to have all the things that were in his house because he had a Proposition 215 certificate. And he initially, he knew he didn't have to consent, so he initially withheld consent, but eventually agreed to consent to the search. And that covers everything. And again, there's no evidence in the record at all that Dugan's consent was that the officers had seen other evidence prior to that time. If there are no more questions on the Fourth Amendment issue, I'd like to move on quickly to this Speedy Trial Act violation. The first thing I want to say is that Dugan has waived his right to a dismissal because he failed to move to dismiss prior to trial. 3162A2 makes the Speedy Trial Act violation the defendant's burden, and that's supported by Medina, 524F3 at 982. A motion requires supporting facts, and this Court said that very clearly in Alvarez-Perez at 629F3 at 1061. Prior to his October 2007 trial, Dugan never followed up on his concern. He made some motion about having some concern on April 16, 2007. The district court in response to that said, well, give me a Speedy Trial Act calculation. By the next week, April 23, 2007, the government had provided a Speedy Trial Act calculation indicating that the 70 days had not run, and Dugan's counsel said that he would notify the district court either by stipulation or ask to be put on calendar if his Speedy Trial Act calculation would result in some difference from the government's. And that's at the first volume of the excerpts of record that the defendant – that the appellant submitted at pages 89 to 90. Dugan never did. Dugan's counsel didn't do that. Neither did Dugan. And Dugan represented himself for periods of time after the Feretta inquiry prior to his trial in October 2007. So he waived it. And under Zedner, which the Supreme Court case Zedner, the Speedy Trial Act is crafted and designed with a strong interest in preventing undue gamesmanship, which there clearly was in this case. It was found by both district judges who presided over this case that Dugan really manipulated things. He was out of custody, and he had multiple rounds of attorneys that he retained. He did everything he could to push the trial off, and then it was only after he had trial and he was convicted that he then decided that everything was essentially tainted by the prolonged duration prior to his trial. So he clearly waived it. And putting aside the waiver on the merits, the pretrial motions that he filed under Henderson clearly waived almost all the periods of time that he challenges in this case. Under Henderson, the time between the pretrial filing and the time that the hearing is concluded, plus any time necessary for subsequent submissions, plus up to 30 days for advisement, is automatically excluded. That delay does not have to be reasonable. It's automatic. It doesn't have to be prompt. That's the very clear holding in Henderson. They've – they could have, and they were – offered the opportunity to interpret the statute in a different way and said, no, that's not how we're going to interpret  There's no promptness requirement. There's no reasonable requirement. So the motion to dismiss the indictment was filed February 18, 2004, and it was eventually conceded after the Supreme Court reversed Raich in July 13, 2005. So that entire period of time is excluded. Beyond that, the two periods of time that are not covered by the motions are covered by two stipulations, a May 23, 2003 order, which excluded a period of time, and an October 7, 2003 order, which excluded time. Both of these orders were based on factual stipulations by the defendant, by Dugan. This Court has said that a district court may fulfill its Speedy Trial Act responsibilities by adopting stipulated factual findings, and that's in both Ramirez-Cortez as well as Medina. In these two cases, these two stipulations, these two orders are both limited in time. They were based on facts that said that the defendants' counsel needed additional time to prepare, that they needed time, the government also needed time to prepare, that they would be unavailable for periods of time. So there are clear references to the ends-of-justice purposes of continuity of counsel and reasonable time necessary for effective preparation, and provided factual bases. So because of these, that's sufficient for an ends-of-justice finding. And in fact, Dugan should be judicially stopped from arguing otherwise. The Court has said that judicial estoppel occurs when somebody, a defendant such as Dugan, has taken a position at one point and basically foisted or persuaded the district court to take a position based on those positions. And then it should be prohibited from arguing otherwise the contrary. And that's exactly what Dugan is trying to do in this case. He at the time stipulated that these were sufficient bases for exclusion and the court has now said that they were not. So he is judicially stopped. I see my time has run out. If there are no more other questions, I would ask for affirmance. Roberts. No further questions. Thank you, counsel. Mr. Olovsky, you have a few seconds, as I recall. 37. I have 4 minutes and 45 seconds if I'm not overstepping my bounds, because I reserved 4. I'm sorry? I think I reserved. I didn't. No, you did not. No. The rules of this Court are very clear and longstanding. You have the total amount of time that's on the clock. If you wish to reserve some time, you will stop yourself at whatever time you feel convenient, and the remaining time, such as 37 seconds, is what you have. Thank you, Your Honor. So the idea that you don't believe the victim of domestic violence doesn't work here. The officer approaches the woman. He either believes her or he doesn't. She says, I'm not hurt. If he believes her, that's the end of it. If he doesn't believe her, that's because he thinks she's the victim. She's found the victim. There's no need to go look for the victim in the house. He should take her away. That can't be the basis for the searching the house. I would also say the – I'm not aware of the Mejia case, so I didn't bring that to the Court's attention. But I would say here the officers are not lawfully in the house. They're lawfully in the enclosed patio. So they would be going into the house. So that might be a way to distinguish Mejia, but I've not read it. So my time is up. I can't address the Speedy Trial Act issues. Thank you. Thank you, counsel. Before we adjourn, I'm going to ask Ms. Chen, please, to provide opposing counsel and three copies to the panel of that citation to Mejia. There's a form that the deputy clerk can provide you, and you can take care of that, please, before you leave the courtroom. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Graber, Bea